IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

NORTON V. CITY OF HICKMAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RICHARD A. NORTON, JR., AND CONNIE J. NORTON,
HUSBAND AND WIFE, APPELLANTS,

V.

CITY OF HICKMAN, NEBRASKA, APPELLEE.

Filed July 25, 2017.    No. A-16-085.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Reversed and remanded for further proceedings.

Donald J. Pepperl, P.C., L.L.O., for appellants.

Kelly R. Hoffschneider, of Mattson Ricketts Law Firm, for appellee.

MOORE, Chief Judge, and INBODY and RIEDMANN, Judges.

INBODY, Judge.

### INTRODUCTION

Richard A. Norton, Jr., and Connie J. Norton (the Nortons) appeal the order of the Lancaster County District Court granting summary judgment in favor of the City of Hickman and dismissing the Nortons' inverse condemnation action. For the reasons that follow, we reverse the order granting the City's motion for summary judgment and remand the cause for further proceedings.

### STATEMENT OF FACTS

Our statement of facts is taken from the statement of facts contained in the district court's order which provided as follows:

On or about August 26, 2005, the Nortons took title to the real property that is the subject matter of this lawsuit ("the Norton Property") by virtue of a Warranty Deed recorded as Instrument No. 2005050052 in the Office of the Register of Deeds of Lancaster County. . . . The Norton Property consists of four tracts of land generally located west of the intersection of Fifth Street and Cedar Street and south of Sixth Street Court in southwest Hickman. . . . The Norton Property has been located in the 100-year floodplain as determined by the Federal Emergency Management Agency ("FEMA") at all times during the Nortons' ownership of the Norton Property. . . .

On September 20, 2005, after appropriate notice was published and posted, the City of Hickman Planning Commission recommended approval for a Preliminary Plat for a subdivision located adjacent to and north of the Norton Property known as the Villas at the Village located on both sides of West Sixth Street Court. . . . After appropriate notice was published and posted, the City of Hickman City Council on October 11, 2005, approved the Preliminary Plat for the Villas at the Village subdivision. . . .

After appropriate notice was published and posted, the City of Hickman City Council on December 13, 2005, approved Ordinance No. 2005-30 creating Street Improvement District No. 2005-1 for the paving, grading, curbing and guttering, drainage and storm sewer, and incidental work for Cedar Street from Hickman Road to Sixth Street and Sixth Street Court from Cedar Street west approximately 450 feet to the end of Sixth Street Court adjacent to the Villas at the Village subdivision. . . . After appropriate notice was published and posted, the City of Hickman City Council on December 27, 2005, adopted Ordinance No. 2005-31 and approved the Final Plat for the Villas at the Village subdivision. . . . Grading and paving for the Villas at the Village subdivision was completed in 2006. . . .

As part of the paving project for the Villas at the Village subdivision, an elevated sidewalk was constructed just west of the Sixth Street Court cul-de-sac near the far northwest corner of the Norton Property over a drainway or swale flowing northwesterly through the Norton Property. The elevated sidewalk formed a dam and the City of Hickman placed an 18-inch culvert at the bottom of the dam. . . . Additionally, as part of the Villas at the Village paving project, the intersection at Sixth and Cedar Streets was reconstructed to include a north to south cross-gutter that directed the flow of runoff from 0.51 acres on the west side of Cedar Street south along Cedar Street with the water being discharged into the unnamed drainage channel at the intersection of Fifth and Cedar Streets. . . . Prior to this reconstruction, that flow would have continued in a westerly direction along Sixth Street. . . . .

On December 8, 2009, after appropriate notice was published and posted, the City of Hickman City Council approved Ordinance [No.] 2009-20, creating Street Improvement Project No. 2009-2, which paved Fifth Street from Cedar Street to Maple Street and Cedar Street from Fifth Street to Sixth Street; adjacent and to the east of the Norton Property. . . . Street Improvement District No. 2005-1 and Street Improvement Project No. 2009-2 are hereinafter collectively referred to as "the Projects." Based upon the City of Hickman Project Engineer's records, completion of Street Improvement Project No. 2009-2 was in

October of 2010. . . . As part of Street Improvement Project No. 2009-2, a concrete flume was placed in Fifth Street west of Cedar Street in the public right-of-way, and both Cedar and Fifth Streets were paved with concrete curbs and no storm gutters. . . .

Prior to the City of Hickman's Street Improvement Project No. 2009-2, Cedar and Fifth Streets were asphalt and gravel with grader ditches and culverts on each side. . . . The Nortons previously had two culverts with drives accessing their lots north of Fifth Street and abutting Cedar Street. As a result of Street Improvement Project No. 2009-2, these two culverts and drives were removed and replaced with a concrete curb. . . .The Nortons also had two culverts with drives accessing their lots north of Fifth Street and west of Cedar Street. As part of Street Improvement Project No. 2009-2, these two culverts and drives were removed and replaced with the concrete flume and a drainway flowing west. . . . Also, as a part of the Street Improvement Project No. 2009-2, the culvert abutting Cedar Street south of Fifth Street was removed and replaced with a concrete curb. . . .

On or about June 26, 2012, the Nortons were sent via certified mail a Notice of Hearing on Special Assessments for Street Improvement Project No. 2009-2 along with a list of assessed values and a map of Street Improvement Project No. 2009-2. Richard Norton accepted the certified mail on July 2, 2012. . . .

The Projects were all located within the FEMA designated 100-year floodplain. . . . The Projects and the Norton Property all have a Base Flood Elevation ("BFE") of 1,244 feet, which is the elevation associated with a 100-year flood or a flood with a one percent chance of occurrence in any given year. . . . During a 100-year storm event for the Hickman Branch of Salt Creek, the Norton Property and the area located in the Projects will be inundated below the BFE of 1,244 feet. . . . Any development of property located in the FEMA designated 100-year floodplain (including the Norton Property) requires fill of the property to elevate the ground around any proposed structure to the Hickman Branch BFE. Any structures must be constructed with the lowest finished floor elevation at least one foot above the Hickman Branch Base Flood Elevation in order to comply with local floodplain regulations. . . .

On November 9, 2012, the Nortons first commenced their inverse condemnation action against the City of Hickman through the filing of their Petition for Appointment of Appraisers before the County Court of Lancaster County, Nebraska. . . . On December 12, 2012, the Appraisers appointed by the County Court of Lancaster County, Nebraska met as required by Nebraska law. . . . On December 12, 2012, the Appraisers carefully inspected and viewed the real estate alleged to be damaged as described in the Petition for Appointment of Appraisers, and heard all parties interested therein to the amount of damages while inspecting and viewing the Norton Property. . . . On December 12, 2012, the Appraisers found and assessed $0.00 in damages suffered by the Nortons by reason of the actions of the City of Hickman. . . . On January 15, 2013, the Nortons filed their Petition on Appeal with [the district] court.

On September 25, 2014, Thomas W. Kubert and Jason L. Pickerel of Great Plains Appraisal, Inc. inspected the Norton Property on behalf of the City of Hickman and subsequently prepared an Appraisal to determine the value of the Norton Property before

commencement of the Projects and after completion of the Projects using an effective date of appraisal of October 1, 2010. . . . The appraisal from Great Plains Appraisal, Inc. confirmed that the Projects did increase backwater levels and drainage time of the pooling of water on the Norton Property. . . . The appraisal went on to find that additional flooding or pooling of the Norton Property only affects the interim use of the Norton Property and not the highest and best use of the Norton Property as a single family residence development. . . . It is undisputed that the Base Flood Elevation did not change as a result of the Projects, nor did the amount of potential fill dirt required for the Norton Property change as a result of the Projects. . . . It is also undisputed that the Projects did not further restrict or inhibit potential development within the Projects beyond the legal restrictions related to the 100-year FEMA floodplain. . . .

On October 18, 2014, the Nortons filed an Amended Petition. On January 6, 2015, the City filed its Motion for Summary Judgment. On May 1, 2015, the Nortons filed a Third Amended Petition on Appeal. Hearing was held on the City of Hickman's Motion for Summary Judgment on July 28, 2015. Subsequently on August 25, 2015, the City of Hickman filed its Answer to the Third Amended Petition.

In support of its motion of summary judgment, the City of Hickman provided the affidavit of Thomas Kubert, a certified general appraiser. Kubert inspected and completed a retrospective appraisal of the Norton Property. Based on his review, Kubert stated the Norton Property is 100 percent in the FEMA established floodplain and, during a 100-year storm event, the Norton Property would be inundated below the base flood elevation of 1,244 feet.

Kubert stated that in preparing his appraisal, he considered access to the Norton Property before and after the two street improvement projects. Kubert also stated that adequate access exists for the parcel's present interim use as a green space for the North, West, and East tracts; and that the paved concrete roads improved access for the East tracts with general benefits to the West and South tracts. However, regarding the West and South tracts of land, Kubert opined that access could be provided through an easement or an agreement with an adjacent tract, but noted that such easement or agreements are speculative. The North tract was limited before and after the improvement projects because of a sewer and pedestrian easement. The West tract has limited access and visibility because of the right-of-way street which is not paved with concrete or gravel paving, but the installation of the concrete flume did not influence Kubert's street analysis, as the City could provide access if the parcel is developed. The East tract has always had access and curb cuts could be provided by the City if the parcel is developed. The South tract access was limited prior to the street improvement projects. Kubert also noted that as Fifth Street "continues to be a legal [80] foot public platted street which can be used for access upon development of the parcel, the installation of the concrete flume has no significance to the analysis of the before and after value of the parcel."

In Kubert's appraisal, before and after the alleged taking of the Norton Property, the value of the Norton Property remained at $39,710 with $0 as a final estimated amount of damages. Kubert determined that additional flooding or pooling of the Norton Property only affects the interim use of the property, but not the highest and best use of the Norton Property as a single

family residence development. Kubert also found that the base flood elevation of the Norton Property did not change as a result of the street improvement projects, and that the potential fill dirt required for the Norton Property did not change as a result of the street improvement projects, meaning that there were no restrictions to potential development for the Norton Property.

The City also provided the affidavit of Carter Hubbard, a licensed professional engineer, in support of its motion for summary judgment. Hubbard conducted a hydraulic and hydrologic analysis near the Norton Property to determine the effect of the street improvement projects. Hubbard stated that the 2010 project improved drainage as it directed roadside ditches surface runoff to roadside curbs and caused surface runoff to be directed to the concrete flume, reducing ponding of the paved road. Hubbard also said that the flow patterns along Cedar Street and Fifth and Sixth Streets did not change substantially as a result of the street improvement projects. Additionally, Hubbard stated that as a result of the Norton property being in the FEMA 100-year flood plain area, any development of the Norton Property requires property fill to elevate the ground around any proposed structure, with the lowest furnished floor elevation at least one foot above the base flood elevation to comply with local floodplain regulations. Hubbard opined that the City did not intentionally cause damage to the Norton property and could not have foreseen any damage to occur.

The project engineer for the 2010 street improvement project, Brian Chaffin, also provided an affidavit in support of the City's motion for summary judgment. Chaffin indicated that the project was designed using customary engineering standards and that any change in the drainage as a result of the project was negligible and did not have any effect on the Norton Property.

Richard Norton, in an affidavit, claimed that following the 2006 project, he saw a substantial increase in the water runoff on his property, and following his review of the plans for the second improvement project, he expressed his concerns that the project would create severe flooding and access problems for his property. Richard also claimed the second project removed multiple access drives to his property. Moreover, Richard contended that he needed to construct a bridge over the drainway to access two of his lots and that he requested the City grant him an access and maintenance easement, but the City has refused to do so. In a second affidavit, Richard stated that the highest and best use of the Norton Property is residential development. Richard also opined that if the street improvement projects had not taken place, the Norton Property would have been valued at $145,000, but that as a result of the projects, the fair market value of the Norton Property was $0.

The Nortons also provided the affidavit of Richard Danek, a licensed real estate appraiser. Danek stated that the street improvement projects damaged the Norton Property as it increased flooding, and that the damages occur "irrespective of whether the increased flooding occurs outside the 100[-]year floodplain elevation[.]" Danek claims that it was foreseeable that the street improvement projects would create access and flooding problems and that vacant lots, or green space, have economic value and are damaged by flooding. In his appraisal, Danek indicated that the highest and best use of the property prior to the City's projects was residential development with a fair market value of $105,000; but that the lots now have $0 value as a result of the projects.

In a similar affidavit, Lyle Loth, a professional engineer, opined the foreseeability that the street improvement projects would create access and flooding problems. Loth estimated that

velocity at Cedar Street's upper end would increase from two feet per second to five feet per second and Cedar Street's lower end would increase from one feet per second to three feet per second. Specifically, Loth stated that the end results of the projects has caused "the flow of nearly 800 gallons per minute [to be] redirected from its original flow path", that it "could cause temporary flooding west of the [Fifth] and Cedar Street intersection", and that the "periodic flooding and the development of an eroded channel west of the flume has created challenges for the Nortons to access their property."

The Nortons also provided the affidavit of Jane Summers, a real estate agent, who claimed that the Norton Property was extensively damaged as a result of the street improvement projects because they "speed the drainage, dam the drain way, and obstruct or eliminate access, [and] as a minimum, extensively damage the Nortons' property."

In the affidavit of Colleen Norton, she claims that in May 2015, the Norton Property was "inundated in floodwaters" and that "the floodwaters had crossed over the walkway that connects the cul-de-sac on Sixth Street and the bike path to the West."

The district court determined that the Nortons failed to present evidence showing the existence of a genuine issue of material fact that the damage to the Norton Property was a foreseeable result of the street improvement projects to constitute inverse condemnation. The district court determined that the evidence established that there was no damage to the Norton Property as a result of the City of Hickman's projects. The district court determined that the evidence presented showed that the Norton Property has been used as a vacant green space since completing the street improvement projects and that the City has not denied the Nortons access to the property by paving the abutting streets, installing concrete curbs, or installing a concrete flume in a public right of way. Consequently, the district court determined that any claim that they were denied access was not ripe because the Nortons have not yet sought to develop the property. The district court also referenced the award of zero damages by the county court appraisers.

It is from that order that the Nortons have timely appealed to this court.

## ASSIGNMENTS OF ERROR

The Nortons' assignments of error, consolidated and restated, are that the district court erred (1) in determining the street improvement projects did not cause an intentional or foreseeable impairment of their right of access to the Norton Property and an increase in flooding and (2) in considering as evidence the award of zero damages by the county court appraisers.

## STANDARD OF REVIEW

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Cisneros v. Graham*, 294 Neb. 83, 881 N.W.2d 878 (2016). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id.*

## ANALYSIS

### INVERSE CONDEMNATION

The Nortons contend that the district court erred in determining the street improvement projects did not proximately cause material impairment of their access rights to the Norton Property. The Nortons claim it was foreseeable to contemplate loss of access damages because the street improvement project designs planned for the removal of culverts and drives to access the Norton Property. The Nortons additionally contend the district court erred in finding that the street improvement projects did not proximately cause an impermissible increase in flooding that was intentional or foreseeable because the street improvement projects altered, diverted, increased, and sped up storm water flow. The Nortons claim that the street improvement projects resulted in increased flooding as a result of the surface water runoffs direction flow being altered, increasing the flow along the paved streets with concrete curbs to the concrete flume abutting the Norton Property, and increasing the surface water runoff because of the placement of an inadequate culvert downstream.

Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Harris v. O'Connor,* 287 Neb. 182, 842 N.W.2d 50 (2014). Summary judgment proceedings do not resolve factual issues, but, instead, determine whether there is a material issue of fact in dispute. *Peterson v. Homesite Indemnity Co.,* 287 Neb. 48, 840 N.W.2d 885 (2013). If a genuine issue of fact exists, summary judgment may not properly be entered. *Id.*

The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law. *Id.* After the movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence was uncontroverted at trial, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion. *Id.* In the summary judgment context, a fact is material only if it would affect the outcome of the case. *Id.*

"The property of no person shall be taken or damaged for public use without just compensation therefor." Neb. Const. art. I, § 21. The initial question in an inverse condemnation action is whether the government entity's actions constituted a taking or damage of property for public use. *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013). "In order to meet the initial threshold in an inverse condemnation case that the property has been taken or damages 'for public use,' it must be shown that there was an invasion of property rights that was intended or was the foreseeable result of authorized government action." *Id*. at 493, 827 N.W.2d at 495. "All damages immediate and prospective which result from the taking of property by the exercise of the power of eminent domain must be compensated in the original condemnation proceeding." *State v. Cheyenne County*, 157 Neb. 533, 539, 60 N.W.2d 593, 597 (1953).

"The right of an owner of property which abuts on a street . . . to have ingress to and egress from his premises by way of the street is a property right in the nature of an easement in the street,

and the owner cannot be deprived of such right without due process of law and compensation for loss." *Buck's, Inc. v. City of Omaha*, 22 Neb. App. 541, 546, 857 N.W.2d 580, 585 (2014). However, the access right of an abutting property owner to a public road is not unlimited. *Id*. Rather, the abutting property owner is entitled to reasonable access to abutting property if reasonable access remains. *Id*. "The measure of the right of the owner of property abutting a street to access to and from the property by way of the street is reasonable ingress and egress under all the circumstances." *Craig v. State*, 19 Neb. App. 78, 81-82, 805 N.W.2d 663, 666 (2011). "Whether the right of access . . . has been destroyed or materially impaired is a question of fact which must be determined upon the particular facts in each case." *W. E. W. Truck Lines, Inc. v. State*, 178 Neb. 218, 225, 132 N.W.2d 782, 787 (1965).

"Surface water is a common enemy and the proprietor may by embankment or dike or otherwise defend himself against its encroachments and will not be liable in damages which may result from the deflection and repulsion defended against, provided that the proprietor in making defense on his own land himself exercised ordinary care, and provided he so uses his own property as not to unnecessarily and negligently injure another." *Robinson v. Central Nebraska Public Power & Irr. Dist.*, 146 Neb. 534, 542, 20 N.W.2d 509, 513 (1945). "[W]ater flowing in a natural drainageway may not lawfully be diverted and cast upon the land of an adjoining landowner to his damage where it was not wont to run in a state of nature. Nor may surface waters be collected and discharged through an artificial channel in unusual quantities upon land of another, except into a natural drain." *Wells v. Miller*, 173 Neb. 780, 784-85, 115 N.W.2d 137, 140 (1962).

The district court, in its granting of the City's motion for summary judgment, determined that the flooding issue was whether the increased flooding was substantially certain to result from the street improvement projects. The district court determined that the increased flooding was not a foreseeable result of the City's street improvement projects because of the evidence that the Norton Property "had always been subject to flooding and pooling of backwater due to its location in the 100-year FEMA floodplain." District Court Order at 12. However, the district court acknowledged that the Nortons presented evidence of value loss of the Norton Property due to the increased flooding, that the projects increased the amount of surface water abutting the Norton Property, and that flooding on the Norton Property increased after the projects.

In this instance, summary judgment was not properly entered as there are genuine issues of material facts regarding whether it was a foreseeable result of the projects that there would be increased flooding and a loss of access to the Norton Property. The Nortons' witnesses provided multiple declarations regarding how the projects altered and sped up drainage, dammed drainways, obstructed and eliminated access, increased velocity of storm and floodwaters, redirected water movement, and required the need for the construction of private access drives, bridges, or culverts. Moreover, multiple affidavits expressed that it was foreseeable that the projects would increase foreseeable flooding and access problems, causing a substantial loss of fair market value of the Norton Property a result of the projects. Because there are genuine issues of material facts as to whether the damage or destruction to the lots as a result of increased flooding and loss of access was an intentional or foreseeable result of the projects, it was inappropriate for the district court to grant the motion for summary judgment.

The Nortons argue that the award of the county court appraisers should not have been considered by the district court in its factual determination of damages because county court condemnation proceedings are administrative rather than judicial and there are no procedural or evidentiary safeguards.

In its order granting the motion for summary judgment, the district court, in a footnote, indicated that the Nortons claimed that the county court appraisers' award was inadmissible in the district court. Relying on Nebraska Supreme Court case *Langdon v. Loup River Public Power Dist.*, 142 Neb. 859, 9 N.W.2d 201 (1943), the district court noted that evidence regarding the appraisers' award was inadmissible evidence for a jury. The district court also noted that the county court appraisers' award amount is contained in the pleadings and that the court may properly consider it with the evidence presented.

The City claims that "[t]he Norton's Third Amended Petition references the transcription of the County Court proceedings in Paragraph 9[,] and in Paragraph 10 makes references to the Assessment of Damages conducted by the Appraisers appointed by the County Judge of Lancaster County[.]" Brief for appellee at 25.

Paragraph 9 of the Norton's third amended petition indicates that the Nortons state and allege:

That the plaintiff/condemnees instituted inverse condemnation proceedings before the County Judge of Lancaster County, Nebraska for the purposes of determining the plaintiff/condemnees' damages; that the taking of the defendant/condemner is described in the Petition for Appointment of Appraisers *which is found in the transcript* on appeal in this matter and incorporated herein by reference as is fully set forth herein[.]

(Emphasis added.)

Additionally, paragraph 10 of the third amended petition states and alleges:

That on the 12th day of December 2012, *the appraisers* appointed by the County Judge of Lancaster, Nebraska *assessed the damages* caused by the actions of the defendant/condemner; that said report of appraisers purports to include all damages to which the plaintiffs/condemnees might be entitled by reason of the acquisition of the defendant/condemner; that the damages allowed by the appraisers appointed by the County Judge of Lancaster County, Nebraska, are wholly inadequate and fail to justly compensate the plaintiffs/condemnees for the damages they have suffered by reason of the defendant/condemner's actions.

(Emphasis added.)

It appears that paragraph 9 of the third amended petition does reference the transcription of the county court's proceedings and that paragraph 10 of the third amended petition does make reference to the assessment of damages conducted by the appraisers. However, it does not appear that paragraph 10 specifically references that the appraisers came back with $0 in damages.

Additionally, it does not appear that the appraisers' award of $0 damages was ever admitted into evidence or was part of the pleadings.

As the appraisers' award of $0 damages was not included as evidence or as part of the pleadings, it was inappropriate for the district court to consider the appraiser's award in its determination.

## CONCLUSION

As there are genuine issues of material facts existing whether there was a foreseeable result of the projects that there would be increased flooding and a loss of access to the Norton Property, we reverse the district court's order granting summary judgment to the City of Hickman. The district court further erred in considering the county court appraisers' award in its determination. We reverse the order granting summary judgment to the City and remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.